United States Court of Appeals,

Fifth Circuit.

No. 91–4686.

In the Matter of Alvin and Eddie Mae WASHINGTON, Debtors.

RTC, as Conservator for Oak Tree Federal, substituted in place and stead of Oak Tree Savings Bank, S.S.B., Appellant,

v.

Alvin and Eddie Mae WASHINGTON, Appellees.

Aug. 4, 1992.

Appeal from the United States District Court for the Western District of Louisiana.

Before SMITH and EMILIO M. GARZA, Circuit Judges, and KENT, District Judge.[*][*]

ELIO M. GARZA, Circuit Judge:

Using their Louisiana residence as security, Alvin and Eddie Mae Washington (the Washingtons) obtained a loan from Oak Tree Savings Bank, S.S.B. (Oak Tree), on June 29, 1989. When effecting this loan, the Washingtons elected to take out credit life[1] and disability insurance through Oak Tree;  this insurance was not a requirement for making the loan.  On September 5, 1990, faced with a threatened suit and foreclosure against their residential property, the Washingtons filed a joint Chapter 13 petition in bankruptcy court and submitted a plan for paying the debt due Oak Tree.[2]  Oak Tree objected to this plan on the grounds that its claim against the Washingtons is secured "only by a security interest in real property that is the debtor's principal residence[,]" and that

---

[*]District Judge of the Southern District of Texas, sitting by designation.

[1]The term "credit life" commonly refers to "insurance sold to debtors for the purpose of satisfying any unpaid balance of the debt existing upon death of the debtor during the intended term of a loan." *In re Stiles,* 74 B.R. 708, 710 (Bankr.N.D.Ala.1987).

[2]The promissory note executed by the Washingtons on June 29, 1989 made $16,102.90 in principal payable to Oak Tree at a 12.5 percent interest rate.  The note was to be paid in thirty six equal monthly installments of $538.70.  The proposed plan submitted by the Washingtons on September 5, 1990 modifies the payment schedule to 36 payments of $444.44.

modification of the original mortgage contract constitutes a violation of 11 U.S.C. § 1322(b)(2).[3]

The bankruptcy court found that the insurance the Washingtons elected to take out through Oak Tree constitutes additional security for section 1322(b)(2) purposes and held that the proposed modification should be allowed. The district court affirmed. Finding that section 1322(b)(2) bars modification of the Washingtons' mortgage contract, we reverse.


I

This case involves a single issue: whether credit life and disability insurance is security within the meaning of 11 U.S.C. § 1322(b)(2), thus allowing the modification of a secured creditor's claim.[4] Although other courts have considered this very issue, they are divided, and our analysis moves along the jagged fault line running between their decisions.[5]

---

[3]Section 1322(b)(2) provides that:

> (b) Subject to subsections (a) and (c) of this section, the plan may—
>
> (2) modify the rights of holders of secured claims, *other than a claim secured only by a security interest in real property that is the debtor's principal residence,* or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims....

11 U.S.C.A. § 1322(b)(2) (emphasis added).

[4]Stressing that their proposed plan would satisfy their debt obligation to Oak Tree, the Washingtons assert that there is a threshold issue we must decide before reaching this primary issue—whether a claim is modified when all defaults are cured and the creditor is paid the full value of its claim. The Washingtons did not properly raise this issue below and, therefore, we will not address it now. *See Fransaw v. Lynaugh,* 810 F.2d 518, 523 (5th Cir.) ("[W]e will not consider [this issue] because of our well-established practice of refusing to address issues raised for the first time on appeal."), *cert. denied,* 483 U.S. 1008, 107 S.Ct. 3237, 97 L.Ed.2d 742 (1987).

[5]*See, e.g., In re Ireland,* 137 B.R. 65, 70–71 (Bankr.M.D.Fla.1992) (credit life and disability policies do not constitute "additional security" for section 1322(b)(2) purposes); *In re Jackson,* 136 B.R. 797, 800–801 (Bankr.N.D.Ill.1992) (boilerplate language securing mortgage by insurance proceeds and fixtures in addition to residence does not constitute additional security); *In re Wright,* 128 B.R. 838, 844 (Bankr.N.D.Ga.1991) (creditor's rights under security deed to returned, unearned, and payable insurance premiums upon foreclosure do not constitute additional security to modify debt); *In re Selman,* 120 B.R. 576, 579 (Bankr.D.N.M.1990) (credit life and hazard insurance policies constitute additional security); *In re Braylock,* 120 B.R. 61, 64 (Bankr.N.D.Miss.1990) (where policy was obtained optionally, unearned premium is refundable to debtor, and proceeds become available only upon debtor's death, policy is not additional security interest permitting modification of secured claim); *In re Diquinzio,* 110 B.R. 628, 629

Our review of these decisions indicates that courts have begun to step over this fissure and toward a consensus that credit life and disability insurance does not constitute additional security. *See Ireland,* 137 B.R. at 70–71; *Jackson,* 136 B.R. at 800–801; *Wright,* 128 B.R. at 844; *Braylock,* 120 B.R. at 64; *Diquinzio,* 110 B.R. at 629. Strictly interpreting section 1322(b)(2)'s statutory language,[6] these courts have reasoned that credit life and disability insurance policies are merely contingent interests—interests that are illusory until the occurrence of some triggering event and not security interests for section 1322(b)(2) purposes. *See Jackson,* 136 B.R. at 802 ("[T]he boilerplate language granting the mortgagee the right to receive and use property insurance proceeds in the event of some destruction of the property does not create an additional type of collateral securing the mortgage obligation."); *Braylock,* 120 B.R. at 63 ("Credit life insurance only becomes available when an unfortunate event occurs, i.e., the death of the debtor.").[7]

---

(Bankr.D.R.I.1990) ("[W]e reject (this time without difficulty) the debtors' contention that ITT's contingent interest in a credit life insurance policy represents additional security which would entitle the debtor to modify ITT's mortgage payments in its Chapter 13 plan. This argument is totally without merit."); *In re Ross,* 107 B.R. 759, 762 (Bankr.W.D.Okla.1989) ("the common, "boilerplate' language in mortgage instruments, referring to *insurance,* rents and profits, buildings, improvements, machinery, equipment and the like, did not constitute additional security") (emphasis added); *Transouth Fin. Corp. v. Hill,* 106 B.R. 145, 146–47 (W.D.Tenn., E.D.1989) (optional credit life and disability insurance written in connection with loan constitutes additional security for modification); *In re Wilson,* 91 B.R. 74, 76 (Bankr.W.D.Mo.1988) (where creditor took security interest in three insurance policies, not only in proceeds but in the return premiums, insurance constitutes additional security); *In re Stiles,* 74 B.R. 708, 710 (N.D.Ala.1987) (interest in policy of insurance on lives of debtors constitutes additional security).

[6]Courts must rely upon the plain meaning of the statutory language, especially since the legislative history of the Bankruptcy Code does not offer explicit guidance as to what constitutes "other security" under 11 U.S.C. § 1322(b)(2). *See In re Harris,* 94 B.R. 832, 835 (D.N.J.1989) ("The "plain meaning' of the language is the "primary and ordinarily the most reliable, source of interpreting the meaning of a statute.' ") (citation omitted); *see also Ireland,* 137 B.R. at 70, *quoting Diquinzio,* 110 B.R. at 629.

[7]Looking to other sections of the Bankruptcy Code for guidance, the *Wright* court found "other security" to be an item of collateral upon which a lien or security interest has been perfected within the purview of applicable state law. *Wright,* 128 B.R. at 843 (stating that, to secure a debt, a security interest must arise under the security deed and "only properly perfected secured claims will be considered relevant in determining whether the § 1322(b)(2) exception applies"). Accordingly, the court concluded that, in the absence of foreclosure where the creditor held rights to insurance premiums upon foreclosure, "the rights ... to returned, unearned and payable insurance premiums do not constitute additional security for debt in the common sense usage of the term in § 1322(b)(2)." *Id.* at 844.

Refusing to even discuss the point, the *Diquinzio* court held: "[W]e reject (this

The plain meaning of section 1322(b)(2)'s language establishes that its purpose is to protect creditors.[8] As recognized by the *Braylock* court, interpreting "additional security" to include optional credit life and disability insurance would defeat this purpose for such insurance has become a standard accompaniment for mortgage loans.[9] Oak Tree, like thousands of other lenders, routinely offers optional credit life and disability policies to its borrowers.[10] Beyond being wholly optional, the

time without difficulty) the debtors' contention that ITT's contingent interest in a credit life insurance policy represents additional security which would entitle the debtor to modify ITT's mortgage payments in its Chapter 13 plan. This argument is totally without merit." *Diquinzio,* 110 B.R. at 629. Relying upon *Diquinzio,* the *Ireland* court also summarily dismissed this point. *See Ireland,* 137 B.R. at 70–71.

[8]*See supra* note 6 (establishing that we must rely upon the plain meaning of the statutory language); *see also supra* note 3 (quoting section 1322(b)(2)). Specifically, the primary purpose of section 1322(b)(2) is to provide stability in the residential home financing industry and markets, as was recognized in *In re Hall,* 117 B.R. 425, 428 (Bankr.S.D.Ind.1990):

> [S]ection 1322(b)(2) protects the rights of home mortgage lenders from such contract modifications as lowering the amount of monthly payments or the contractual interest rate, which would otherwise be permissible, *see In re Ramirez,* 62 B.R. 668 (Bankr.S.D.Cal.1986). Interpreting this section to deprive home mortgage lenders of present value interest to which they would otherwise be entitled under section 1325(a)(5) would harm rather than protect these lenders, and thus [would] be contrary to the purpose of section 1322(b)(2). The Court will not interpret a code provision in a way that is contrary to its purpose when there is an equally, indeed more, supportable interpretation that furthers its purpose.

[9]*Braylock,* 120 B.R. at 63–4:

> Practically every deed of trust which encumbers improved real property contains a provision requiring the borrower to acquire and maintain insurance coverage to protect against fire and other casualty losses. To hold that this type [of] insurance coverage constitutes an additional security interest would completely eviscerate the protective exception for residential lenders found in Section 1322(b)(2). Congress would not have enacted a meaningless statute.... [Similarly, c]redit life insurance only becomes available when an unfortunate event occurs, i.e., the death of the debtor.

> Because this Court is of the opinion that the drafters of § 1322(b)(2) did not contemplate that a credit life insurance policy, naming the creditor as the beneficiary, would be considered an additional security interest, this Court ... is not persuaded that one optional credit life insurance policy, where the unearned premium is refundable to the debtor and where the proceeds of which would only become available on the debtor's death, is an additional security interest which negated the protective exception found in § 1322(b)(2).

[10]The *Stiles* court implicitly rejected the assertion that such insurance is essentially "boilerplate" in nature and incidental to the underlying obligation by holding that a lender's assertion that such life insurance is merely a contingent interest was "defeated by its own conduct

decision to obtain this coverage is revocable: The Washingtons can terminate their policy at any time during the term of their mortgage without seeking Oak Tree's permission.

Although it is conceivable that a credit life and disability insurance policy that (1) is a prerequisite for obtaining a loan,[11] (2) was separately pledged as additional security,[12] and (3) contains

---

in accepting it as collateral." *Stiles,* 74 B.R. at 710. Similarly, relying upon *Stiles,* the *Selman* court questioned "Why would [the creditor] be named as payee/beneficiary of the two policies if not to further secure its position?" *In re Selman,* 120 B.R. 576, 578 (Bankr.D.N.M.1990).

> We disagree. Although it may be in the creditor's interest for its borrower to purchase such insurance to assure that the borrower's obligation will be satisfied in the event of misfortune (creditors, therefore, often go so far as to arrange and encourage such insurance), we do not find that this constitutes "accepting it as collateral." Even when their creditors are the beneficiaries, such insurance policies assure borrowers that—as is generally true with life insurance—should misfortune occur, their estates will be free from the burden of their debt obligation.

[11]The significance of this variable was recognized in *Braylock,* 120 B.R. at 63. Noting that "[t]he promissory note clearly indicates that credit life insurance was not required to obtain the loan", the *Braylock* court held "[this court] seriously doubts that the voluntary election by a debtor to obtain a credit life insurance policy, even though the lender is designated the policy beneficiary, creates a "security interest.' " *Id.*

[12]The *Ireland* court, in reviewing the relevant case law on this point, acknowledged the significance of this variable:

> As stated by the district court in *In re Diquinzio,* 110 B.R. 628 (Bankr.D.R.I.1990), a credit life policy was not additional security, and its existence did not permit modification of the debtors' mortgage. *Id.* at 629. Additionally, the Diquinzio court distinguished cases such as *United Companies Fin. Corp. v. Brantley,* 6 B.R. 178 (Bankr.N.D.Fla.1980), where a life insurance policy was separately pledged as additional security. In *United Companies Fin. Corp.,* the court noted the rationale behind its ruling was specific to the circumstances of that case. The court noted that the life insurance policy pledge document was entitled "Assignment of Life Insurance Policy as Collateral."

*Ireland,* 137 B.R. at 70–71.

an assignment of interest[13] or (4) contains other language perfecting a security interest in the policy[14] might serve as "additional security" for section 1322(b)(2) purposes, this is not the case before us. The Washingtons' credit life and disability policy satisfies none of these conditions. Therefore, we find that, in the absence of misfortune, the Washingtons' insurance policy is at best illusory security—security contingent upon events that may never occur, and we conclude that such illusory security is simply not enough to divest Oak Tree of its section 1322(b)(2) protection.

## II

For the foregoing reasons, we REVERSE.


\* \* \* \* \* \*

---

[13]The significance of this variable is acknowledged in the cases the Washingtons rely upon for the proposition that a creditor's interest in an insurance policy constitutes additional security. *See In re Transouth Fin. Corp. v. Hill,* 106 B.R. 145, 146 (W.D.Tenn.1989); *In re Wilson,* 91 B.R. 74, 76 (Bankr.W.D.Mo.1988); *In re Stiles,* 74 B.R. 708, 710 (Bankr.N.D.Ala.1987). These courts acknowledged that the underlying mortgage documents contained an express written clause specifically assigning creditors any proceeds—including unearned, returned, or premium refunds—which might become payable. *See Transouth,* 106 B.R. at 146; *Wilson,* 91 B.R. at 76; *Stiles,* 74 B.R. at 710.

[14]The *Braylock* court acknowledged the significance of such language when, in distinguishing the case before it from *Wilson,* 91 B.R. at 74, the court noted that the loan documentation in *Wilson* contained specific language perfecting a security interest in the policies at issue. *See Braylock,* 120 B.R. at 63–64; *see also Wilson,* 91 B.R. at 76.